WILLIAM S. FRATES, II, P.A.
William S. Frates, II
830 Azalea Lane
Vero Beach, FL 32963
Tel: (772) 231-5896
FBN 107898
Email: billf@frates.com

THOMAS F. DASSE
14646 No. Kierland Blvd., Suite #235
Scottsdale, AZ 85254
Tel: (480) 998-8222
Email: tdasse@dasselaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ALFRED GONZALEZ, as personal representative of The Estate of MARTIN E. GONZALEZ, Deceased, and ALFRED GONZALEZ, individually, and for the benefit of MARY L. GONZALEZ, as surviving parents of MARTIN E. GONZALEZ, Deceased, | CASE NO. CV00-611 TUC (JM) |
| Plaintiff, | **PLAINTIFFS' INITIAL MEMORANDUM OF LAW FILED IN OPPOSITION TO DEFENDANT CTNA'S MOTIONS IN LIMINE REGARDING THE ADMISSIBILITY OF OTHER SIMILAR INCIDENTS** |
| v. | |
| CONTINENTAL TIRE NORTH AMERICA, INC., F/K/A/ CONTINENTAL GENERAL TIRE, INC., an Ohio Corporation, | |
| Defendant, | |

The Plaintiffs, above-named, file this their Initial Memorandum of Law

Filed In Opposition to Defendant, Continental Tire North America, Inc. ("CTNA's)

Motions in Limine Regarding Admissibility of Other Similar Incidents, as follows:

**Introduction:**

Defendant CTNA has filed eleven separate motions in limine totaling approximately one hundred and fifty-one pages, that seeks to exclude evidence of other similar incidents involving substantially similar tires. These motions in limine are contained in Docket Nos. 414, 415, 418, 419, 420, 429, 431, 432, 434, and 436, 447. These motions in limine should be denied because the other similar incidents which Plaintiffs seeks to admit into evidence involve tires that are substantially similar to the subject tire. This following memorandum sets forth the rationale and law that relates to the admissibility of other similar incidents of substantially similar products within the context of products liability litigation.

**I.       The Rationale and Law Governing Admissibility of OSI Evidence**

The legal nature of a defective design case is conceptually different from other types of tort cases in a way that significantly affects the relevance and admissibility of other incident evidence. The core issue of liability in a defective design case revolves around the relative safety or danger of the design itself. The common law rule developed in the context of cases which presented utterly different legal issues than those presented by a defective design product case. That is, the conceptual basis for the relevance and probative value of other incident evidence in a defective design product case is significantly different from the conceptual basis of the tort cases which served as the framework for the development of the common law rule. There are essentially two characteristics of this conceptual difference.

**A. Individual Conduct Versus the Condition of the Product**:

In the older cases, other incident evidence was offered to show that the personal behavior of an individual was negligent; that is, his conduct on the occasion of the incident fell below the accepted norm. In this instance, the demands on the similarity requirement are great. The fact that a particular person behaved in a certain way at one point in time does not necessarily mean that person (much less other persons) behaved that way on another occasion. Thus, the court would be justified in requiring greater proof of similarity between the two incidents. Furthermore, focusing on the conduct of an individual implicates what professors Wright and Graham have described as "restrictive precedents" resulting from the "hostility of many judges . . . toward deterministic theories of human conduct." 22 Charles Alan Wright & Kenneth W. Graham, Jr*., Federal Practice and Procedure* § 5170, at 116 (1978). As will be noted hereafter, liability in a modern day defective design case focuses on the condition of the product-- not on the conduct or behavior of the individual. The distinction is pivotal! In a defective design case, the essential characteristics of similarity are inherently present if both incidents involve the same product design. The demands of the similarity requirement are satisfied by the very nature of the litigation. That is, similarity should be determined by reference to the nature of the defect.

**B. The Likelihood of Change in Condition:**

In older cases, other incident evidence was often proffered in a premises liability case to show the dangerous nature of a condition on the defendant's property. The condition in dispute in a premises liability case may, indeed, be

altered by the forces that normally occur during the passage of time. For example, evidence concerning a condition of the floor of the defendant's department store that existed a long time ago might not shed any light on the condition that existed at the time of the plaintiff's injury. In these older change of condition cases, courts were reluctant to admit other incident evidence. "This reluctance may be traced to the common-law premises cases where the courts were hesitant to allow this type of evidence because the condition of the premises was subject to change due to the weather, passage of time, construction or natural changes." In sharp contrast, the condition that is the object of a relevancy inquiry in a defective design case is unchanged by the passage of time.  In recent years, legal scholars and courts alike have recognized that the theoretical underpinnings of a defective design product case are completely different from the types of cases in which the rule of exclusion was fashioned. Wright & Graham, supra note 25, § 5170; see also Gail A. Randall, Note,  *Product Liability Litigation: Impact of Federal Rule of Evidence 404(b) Upon Admissibility Standards of Prior Accident Evidence*, 61 Wash. U. L.Q. 799, 803 (1983). Although vestiges of the old rule are still apparent, a reading of the cases decided in the last twenty years reveals a strong trend favoring the admission of other incident evidence in modern day product cases. For the reasons discussed in the following section, the overwhelming majority of cases dealing with a defective design product adopt a rule of inclusion concerning the admission of other incident evidence.

## II.    Policy Basis for a Rule of Inclusion

### A.   Relevant Evidence is Presumptively Admissible:

Rule 401 of the Federal Rules of Evidence provides a broad definition of "relevant evidence." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 makes it clear that relevant evidence is presumptively admissible: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."  The Supreme Court has noted repeatedly and emphatically that the Federal Rules of Evidence are intended to be construed liberally so as to permit the introduction of relevant evidence. For example, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Court stated that Rule 401's "basic standard of relevance . . . is a liberal one," 509 U.S. 579, 587, 113 S. Ct. 2786, 2794, 125 L. Ed. 2d 469, 479 (1993) and in *Beech Aircraft Corp. v. Rainey*, the Court referred to the "liberal thrust of the Federal Rules." 488 U.S. 153, 169, 109 S. Ct. 439, 450, 102 L. Ed. 2d 445, 463 1988).

### B. Other Incident Evidence is Extremely Relevant:

Other incident evidence is extremely relevant in a defective design product case. This conclusion is supported by four observations. Such evidence (a) is pertinent to the basic issue in controversy and therefore conceptually consistent with the basis of product liability, (b) aids the jury in performing its basic function,

5

(c) has great probative value and is highly trustworthy, and (d) is critical to the plaintiff's case.

It could be fairly said that other incident evidence (OSI) is the single most probative evidence on the question of whether the product that forms the basis of the claim is defective. After all, if you want to know if a particular condition is dangerous, what better evidence could you have than information that shows you how the condition manifests itself during real world use? The truth of this observation is either an exercise in unshakable logic or simply an expression of plain old common sense. Compared to other incident evidence, virtually every other category of evidence possesses a characteristic which diminishes either its probative value, its trustworthiness, or both. It provides a clear method of quantifying the type and degree of danger associated with a product. *Johnson v. Colt Indus. Operating Corp*., 797 F.2d 1530, 1535- 36 (10th Cir. 1986) (noting that "the greater the danger, the greater the duty"). *Rimer v. Rockwell Int'l Corp*., 641 F.2d 450, 456 (6th Cir. 1981) (noting that a jury "would be far more likely to find that a design is defective if it learns that the alleged defect resulted in a number of accidents"). *Exum v. General Elec. Co.*, 819 F.2d 1158, 1160-61 (D.C. Cir. 1987) (reversing trial judge's refusal to admit other similar incidents evidence where the evidence was relevant to show both "dangerousness and notice," especially where the jury was being asked to balance the likelihood and the gravity of harm against the burden of precaution necessary to avoid the harm). OSI evidence provides an opportunity to counter the tendency of some jurors to believe that companies don't make bad products.

6

In a case involving mass produced consumer products such as automobiles, members of the jury, the jury's family, and the jury's friends may regularly use products that possess the very condition which the plaintiff is attempting to show is dangerous. Jurors are extremely reluctant to arrive at a decision that requires recognition that they and their family and friends are exposed to a significant risk of harm. People naturally avoid decisions that cause anxiety and favor decisions that reinforce a sense of security. OSI evidence is particularly important in overcoming this psychological phenomenon because it provides jurors with concrete examples of the results of a defective design. e.g., *Rimer*, 641 F.2d 450, 456. OSI evidence provides direct evidence of a product's relevant safety history. Jurors are interested in knowing whether the incident in question is unique or whether the alleged problem has surfaced before. OSI evidence answers that question with solid proof.

OSI evidence provides valuable assistance in persuading the jury that the product is defective by clearly demonstrating where the defect is and how it can cause injury. The evidence is particularly persuasive in cases where the defect is technical and hard for the average person to understand.

Furthermore, OSI evidence lays the foundation for an award of punitive damages. The extent and degree of the defect cannot be adequately demonstrated without proving that the manufacturer knew it had a problem and consciously disregarded the risk to the consumer. OSI evidence can be used to prove what the manufacturer knew, when it knew it, and how often it was notified that the problem was causing death or serious injury.

The majority of recent cases have adopted a standard procedure in dealing with the issue of similarity; namely, making the threshold determination of similarity by reference to the defect involved. See *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1440  (10th Cir. 1992*); Hessen v. Jaguar Cars, Inc.*, 915 F.2d 641, 650 (11th Cir. 1990); *Anderson v. Whitaker Corp.*, 894 F.2d 804, 813 (6th Cir. 1990); *Johnson v. Colt Indus. Operating Corp.*, 797 F.2d 1530, 1524 (10th Cir. 1986); *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 686-87 (11th Cir. 1984*); Kehm v. Proctor & Gamble Mfg. Co.*, 724 F.2d 613, 625-26 (8th Cir. 1983); *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 337-40 (5th Cir. 1980); *Wagner v. International Harvester Co.*, 611 F.2d 224, 230-31 (8th Cir. 1979); *Gardner v. Q.H.S., Inc.*, 448 F.2d 238 (4th Cir. 1971*); General Motors Corp. v. Van Marter,* 477 So. 2d 1291 (Ala. 1984); *Dura Corp. v. Harned*, 703 P.2d 396, 410-11 (Alaska 1985); *Schmutz v. Bolles*, 800 P.2d 130, 131 (Colo. 1990); *Hobart Corp. v. Siegle*, 600 So. 2d 503, 504 (Fla. Dist. Ct. App. 1992); *Berry v. Fruehauf Trailer Co.,* 371 Mich. 428, 429-30, 124 N.W.2d 290, 291 (1963); *John Deere Co. v. May*, 773 S.W.2d 369, 373 (Tex. Ct. App. 1989*); General Motors Corp. v. Lupica,* 237 Va. 516, 520, 379 S.E.2d 311, 314 (1989).

There are several lines of reasoning which justify the courts' adoption of determining similarity by reference to the defect involved in a defective design product case: (1) this approach is consistent with the legal concept of relevance; (2) it is consistent with the manufacturer's legal duty; (3) it is an accurate reflection of what the manufacturer actually does in the design of its products;

and (4) it provides vital assistance to the jury in deciding whether the subject condition is defective or not.

In a defective design case, the similarity requirement is satisfied if the design of the other product is substantially similar to the design of the product involved in the case at bar; that is, if the design of both products essentially involves the same defect. The fact that a common risk of harm can be eliminated by the adopting the same alternative design is a strong indication that the design defect in the two products is substantially similar. *See Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1439-40 (10th Cir. 1992) (upholding district court's admission of 16 reports and a computer printout of other malfunctions involving different model aircrafts, but with engines of a similar generic design and that differences between other incidents and present failure affected the weight of evidence not its admissibility*); Johnson v. Colt Indus. Operating Corp.*, 797 F.2d 1530, 1533-34 (10th Cir. 1986) (admission of other incident evidence involving different model gun with same defect as the subject gun*); Ramos v. Liberty Mutual Ins. Co.*,  615 F.2d 334, 399 (5th Cir. 1980), modified, 620 F.2d 464 (5th Cir. 1980) (reversing trial court for excluding evidence of a different model mast with the same defect as the subject mast); *Wagner v. International Harvester Co*., 611 F.2d 224, 232-33 (8th Cir. 1979) (Although most of the prior accidents involved less stable wheeled tractors, the jury could consider that evidence and draw from it the conclusion that IHC should have foreseen rollovers of Model 500C crawlers.); *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1315-16 (3d Cir. 1978) (Airworthiness Directives

prepared by the FAA admissible because the different models of airplanes had the same design defect; "the definition of the class to which a particular (Directive) applies excludes planes whose designs are relevantly different from the planes in which the underlying theory was discovered*"); Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1143, 1147 (5th Cir.), reh'g denied, 570 F.2d 1391 (5th Cir. 1978) (affirming admission of testimony of six truck drivers who experienced difficult handling characteristics of different model trucks all of which showed common design defect); *Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 1441 (S.D.N.Y. 1990) ("In product liability actions it is frequently difficult to judge which of a manufacturer's products are sufficiently similar to the alleged defective product to be subject to discovery. Generally, different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation."); *Fireman's Fund Ins. Co. v. EMC Motor Co.*, 132 F.R.D. 39, 41 (W.D. Pa. 1990) ("*In Bowman v. General Motors Corp.*, 64 F.R.D. 62, 70-71 (E.D. Pa. 1974), the court permitted discovery of subsequent models of the same automobile in litigation. In response to GM's contention that the fuel tank assembly of the later models was substantially different from that of the subject model, the court noted that identity is a function not only of component parts, but also of engineering principles"*); Bastian v. TPI Corp.*, 663 F. Supp. 474, 477 (N.D. Ill. 1987) (allowing other incident evidence involving other model baseboard heaters; differences cosmetic and did not relate to design defect which was present in all models*); General Motors Corp., v. Van Marter*, 447 So. 2d 1291, 1293 (Ala. 1984) (affirming other incident evidence

concerning different model car and relied on testimony of plaintiff's expert that the defect in the electrical system was "essentially the same"); *Hobart Corp. v. Siegle*, 600 So. 2d 503, 504 (Fla. Dist. Ct. App. 1992) ("The trial court did not abuse its discretion in admitting evidence of prior accidents involving an earlier model of Hobart's product; the evidence demonstrates that the children injured in those accidents had put their hands into the throat of a substantially similar product); *Simmons v. American Honda Motor Co*., CA NO. 1:91-CV-0079 (N.D. Ga., Dec. 7, 1992); *Rucker v. Norfolk & Western Ry. Co*., 77 Ill. 2d 434, 441, 396 N.E.2d 534, 537-38, 33 Ill. Dec. 145, 148-49 (1979) (The court affirmed admission of 42 prior accidents involving punctures of LPG tank cars for the purpose of showing the danger of design. The cars were punctured differently, but the defect could be fixed in the same manner*); Erickson v. American Honda Motor Co.*, 455 N.W.2d 74, 78-79 (Minn. Ct. App. 1990) (affirming admission of evidence of other incidents involving 3-wheel ATV's in case involving a 4-wheel ATV as relevant to retail seller's knowledge of danger arising from improper operation of machine); *Preston v. Montana Eighteenth Judicial District Court*, 936 P.2d 814, 818-20 (Mont. 1997); *Krueger v. General Motors Corp*., 240 Mont. 266, 274, 783 P.2d 1340, 1346 (1989) (The court affirmed admission of other evidence involving different vehicles. The other incidents all involved four-wheel drive transfer care as did the vehicle in the case at bar. All vehicles involved the same "inherent design characteristics" which caused the plaintiff's injury in the present case.); *Robinson v. G.G.C., Inc.*, 107 Nev. 135, 139-40, 808 P.2d 522, 525 (1991) (holding trial court erred in failing to admit evidence of subsequent

accidents involving different model machine with same defect*)*; *John Deere Co. v. May*, 773 S.W.2d 369, 374-75 (Tex. Ct. App. 1989) (affirming admission of a list of thirty-four other incidents involving the same model and/or a different model with the same defect); *General Motors Corp. v. Lupica*, 237 Va. 516, 522, 329 S.E.2d 311, 314-15 (1989) (affirming admission of evidence of malfunctions of power steering in GM vehicles manufactured during 14-year period preceding date of manufacturer of subject vehicle).

**III.    Statement of Relevant Facts:**

Adjustment records, consumer complaints, claims and lawsuit data are documented and analyzed by Defendant Continental Tire North America (CTNA) in its normal course of business.  Such data is critical feedback which CTNA uses to assess its products' real world performance as part of the decision-making process to determine whether its products need to be re-designed. This same data is used by the National Highway Transportation Safety Administration (NHTSA) in assessing whether a product is defective and needs to be removed from the market. As stated by NHTSA adjustment (warranty) and claims data is far more useful for the analysis of potential defect trends. 66 FR 66190-1 (2001 WL 1635633 F.R.).  In this case the Plaintiffs have obtained warranty/adjustment records, complaints, claims, and lawsuit data involving substantial similar tires from Defendant CTNA's internal business records, and from the National Highway Transportation Safety Administration (NHTSA) and court records.

These documents prove that Defendant Continental Tire North America

(CTNA) had on-going problems with tread separations in passenger tires made with the FB170 skim stock.  The FB170 is the same skim stock used on the subject tire and is the same component part that failed in the subject tire. Plaintiffs' expert Robert Ochs has opined that the FB170 skim stock is a defective component part of the subject tire.

The other similar incidents CTNA seeks to exclude also show that CTNA had notice and knowledge that the FB170 skim stock was defective and lacked sufficient adhesive qualities to hold its passenger tires together under normal use, resulting in large numbers of tread separations. Tread separation is the same mode of failure in this case.

CTNA seeks to exclude this relevant and highly probative and trustworthy evidence by contending that Plaintiffs' cannot show substantial similarity between the subject tire and the tires involved in the other claims, lawsuits, accidents, and adjustment returns. CTNA's assertion is incorrect.

The subject tire is substantially similar to the other incident tires in that all have the same component part which failed, i.e. the FB170 skim stock. The subject tire is substantially similar to the other incident tires in that it had the same mode of failure. i.e. tread separation.

CTNA has misstated the law of substantial similarity to require exact similarity which is not the standard within this Circuit. It has been noted many times over that "perfect similarity" is not required, but that dissimilarities brought out on cross-examination go to the weight of the evidence, not its admissibility. Further, when other similar incident evidence is presented to

demonstrate notice or defendant's knowledge as to a dangerous condition, the rule requiring substantial similarity of those accidents with the accident at issue is more relaxed, "and any differences in the circumstances surrounding the occurrences go merely to the weight to be given to the evidence."

In this case Plaintiffs intend to utilize other similar incident evidence for causation, notice and knowledge of the defect or problem, magnitude of problem, magnitude of the danger and/or CTNA's ability to correct the defect or problem. Plaintiffs' also intend to use this evidence to show the subject tire's lack of safety for its intended use, the degree or amount of CTNA's lack of care in correcting the problem to properly assess punitive damages, and CTNA's lack of warnings of known problem and alternatives available. Lastly, other similar incidents involving the FB170 skim stock are admissible to rebut CTNA's defense of no defect in the subject tire and/or CTNA's standard of care in this case.

**Defects Alleged in this Case:**

**a.      Plaintiffs Complaint:**

Plaintiffs amended complaint ¶12 alleges that Defendant CTNA was negligent in designing, testing, manufacturing, assembling, marketing and selling the subject tire, and specifically in using inadequate and improper tire design, including specifications and formulas, and/or using inadequate and improper construction methods and materials, and/or in failing to maintain adequate quality control during manufacture, which caused or allowed the tire belts and/or treads to separate during normal and foreseeable use, causing the tire tread and steel

belts to suddenly peel away from the tire carcass. That the subject tire was incapable of maintaining proper adhesion, incapable of safely sustaining normal and foreseeable driving forces, susceptible to the tread and belts separating, and contained no effective warnings.

**b.  Plaintiffs' experts:**

Plaintiffs' expert Robert Ochs states that the subject tire had half of its service life left when it suffered a premature fatigue failure between its two steel belts; that there was poor adhesion of belts and insulation strips, separation problems with formulation of the belt and insulation rubber, together with specification of insufficient thickness of rubber between belts, as shown in its own testing.

Further, Ochs states that the subject tire's durability problem was the same problem experienced with other CTNA passenger tires that used the same skim stock belt rubber compound (FB 170). The extent of the problem is demonstrated in the warranty return data (adjustments), claims and lawsuits data for CTNA passenger tires made from 1987 -1997 using the same FB 170 skim stock compound.  Lastly, Ochs states that CTNA should have designed and manufactured the subject tire with better rubber, thicker rubber and nylon caps; and that CTNA should have used better manufacturing practices and quality control. Ochs found no evidence of improper tire maintenance or road hazard that might have caused the failure.

Plaintiffs' expert Alan Milner states that the subject tire sustained a classical tread separation failure known by CTNA for decades; that the belt edge

separations initiated at cut steel belt ends progressing by fatigue fracture in rubber between belts leading to sudden catastrophic peel off of tread and top belt; and that the deficiencies of bonding between belts occurred at the time the subject tire was manufactured. Lastly Milner also states that the subject tire lacked adequate known countermeasures and that there was no evidence of extrinsic causation factors.

**Relevancy of Other Similar Incident evidence:**

In cases throughout this country, other similar incidents have been held to be relevant, admissible and useful to a jury in assessing the following:

- causation – the more tread separations, the more likely the tire is either the cause or a substantial contributing factor;
- notice to defendant of a problem with the product, or awareness of a dangerous condition;
- product usage by consumers;
- magnitude of problem;
- magnitude of the danger;
- defendant's ability to correct the defect;
- lack of safety for intended use;
- degree or amount of lack of care in correcting problem to properly assess punitive damages;
- lack of warnings of known problem and alternatives available;
- rebuttal to defense of no defect in product;
- impeachment of defense expert that product is safe, that defect could not occur, that defect would be detectable. (applies even if dissimilar accidents per *Cooper v Firestone,* infra)
- strength of a product;
- standard of care – complaints are considered by engineers in usual course of business.

There are three primary categories of other similar incidents: ( 1) The actual occurrence of an injury producing event;  (2) A "near-miss" i.e., an incident which could have but did not result in injury); See *Collins v. Seaboard Coast Line*

*R.R. Co., 675 F.2d 1185, 1194 (11th Cir. 1982); Genrich v. State, 202 Cal. App. 3d 221, 232, 248 Cal. Rptr. 303, 310 (1988);* and (3) A malfunction in the performance of the product or some other sign indicating a potential failure of the product. *See DaSilva v. American Brands, Inc., 845 F.2d 356, 360 (1st Cir. 1988); Bailey v. Southern Pac. Transp. Co., 613 F.2d 1385, 1388-89 (5th Cir. 1980); Wojciechowski v. Long-Airdox Div. of Marmon Group, Inc., 488 F.2d 1111, 1115-16 (3d Cir. 1973); Olin-Mathieson Chem. Corp. v. Allis-Chalmers Mfg. Co., 438 F.2d 833, 835 (6th Cir. 1971); Otis Elevator Co. v. Robinson, 287 F.2d 62, 64 (5th Cir. 1961); Ford Motor Co. v. Massey, 313 Ark. 345, 355, 855 S.W.2d 897, 902-03 (1993); Schmutz v. Bolles, 800 P.2d 1307, 1311 (Colo. 1990); Whitehouse v. Safeway Stores, Inc., 385 A.2d 755, 756 (D.C. 1978); Ginnis v. Mapes Hotel Corp., 86 Nev. 408, 412, 470 P.2d 135, 137 (1970). See generally 63 Am. Jur. 2d, Products Liability §§ 236, 239 (1996).*

This third category includes consumer complaints; dealer inspection reports; maintenance, service, or repair records;  warranty claims;  warnings directed to the public, individual users, dealers, or other third parties; and instructions for use or maintenance directed to the public, individual users, dealers, or other third parties.  Further, as exemplified by the adjustment data, claims data, lawsuit data, and internal correspondence in this case, the bulk of documentary evidence reflecting the danger of the subject tire is documented in the internal memos and reports of tests and studies performed in CTNA's regular course of business.  As stated by NHTSA "far more useful for analysis of potential defect trends is the tire manufacturer's adjustment (warranty) and

claims data. The adjustment and claims data contain complete identification of the tire make, model, build plant type, and date of production." 66 FR 66190-1 (2001 WL 1635633 F.R.).

The core issue of liability in a defective design case revolves around the relative safety or danger of the design itself.  It is the potential for harm created by the design that gives rise to the defendant's liability. The design of a product is a conceptual abstraction. Although the plaintiff's injury is actually produced by a physical product, the defendant's culpability is nevertheless determined solely by reference to the design. In view of the fact that all products built according to a particular design possess the same condition, the relevance of other incident evidence is based on the proposition that the defect, if it exists, will, in time, manifest itself as the product is used. The condition of the design itself is unchanged by the forces that occur over time.

Evidence that the alleged design defect in this case has manifested itself on other occasions is abundantly relevant.  This other incident evidence has enormous probative value to the jury. For example, compare a defective product case with a typical "who ran the red light?" case. In such a case, the lay members of the jury naturally possess an understanding of the standard by which the defendant's liability is determined. They do not require a technical education to assess the defendant's culpability.  Such a fact set is simple and non-technical.  There is no educational deficit which the plaintiff must fill in order to enable the jury to reach a conclusion that the defendant is guilty of wrongdoing.

Further, a jury is not initially familiar with the normative standard by which to

judge the manufacturer's wrongdoing. It may not be readily apparent to the jury that placing the gas tank in a subcompact car behind and below the rear axle in a known crush zone is dangerous. An understanding of the applicable standard requires an education in matters that are technologically esoteric and factually complex.

In addition, in an effort to educate the jury, plaintiff's counsel must overcome what is sometimes called "psychological inertia." In a case involving mass produced consumer products such as automobile tires, members of the jury and the jury's family and friends, may regularly use products that possess the very condition which the plaintiff is attempting to show is dangerous. Jurors are extremely reluctant to arrive at a decision that requires recognition that they and their family and friends are exposed to a significant risk of harm. People naturally avoid decisions that cause anxiety and favor decisions that reinforce a sense of security. The effect of other incident evidence is that once the jury learns that the defendant's design regularly causes numerous other injuries or deaths, it is likely that they will be able to overcome this psychological inertia.

In *Schine v. Orco Aviation, Inc.,* 2003 WL 2008192 (Cal. App. 2 Dist.) (unpublished opinion) the statement by the jury foreperson, Mr. Hernadez, touches upon the probative nature of this evidence. The *Schine* opinion sets forth the following excerpt from Mr. Hernandez: "During deliberations, I stated that, there were no other accidents like this one, or it would have been brought out during the trial. Had I known about any other accidents similar to this one, it would have made a huge difference for me in my consideration of this case, and

perhaps it would have made a difference to other jurors as well."

While every automotive defect case will include literally dozens of potentially different accident or vehicle details, Courts have noted that "perfect similarity is not required, but that dissimilarities brought out on cross-examination go to the weight of the evidence, not its admissibility." See, e.g., *Campus Sweater & Sportswear Co. v. M.B. Kahn Constr. Co.*, 515 F. Supp. 64, 90 (D.S.C. 1979), aff'd, 644 F.2d 877 (4th Cir. 1981). See also *Rucker v. Norfolk & W. Ry. Co.,* 396 N.E.2d 534, 537 (Ill. 1979) (affirming admission of 42 prior incidents involving punctures of the tank cars despite the fact that the cars were punctured differently because the defect was the same).

In *Bishop v. General Motors Corp.* , 1995 WL 886817 (E.D. Okla. Aug. 18, 1995) the plaintiff's family member was killed when the fuel tank on a C/K pickup truck exploded in a collision. GM filed a motion in limine to exclude evidence concerning other similar incidents. The plaintiff's evidence consisted of a government report of an investigation of C/K pickup truck accidents from which the plaintiff's expert prepared a spreadsheet of 227 other similar post-crash fires. GM urged a ruling that would require proof that each accident involved a similar collision. The plaintiff, on the other hand, urged that the proper evaluation of similarity was by reference to the common defect, not the circumstances of each accident.  After reviewing authority concerning the meaning and purpose of the similarity requirement, the court adopted the plaintiff's approach, stating,  [I]t follows that the determination of "substantial similarity" centers on the similarity of the alleged defect between the subject vehicle and the vehicles involved in other

incidents and the circumstances stemming directly from that defect in each incident which resulted in injury.  Id at *4.

Although most OSI evidence will involve prior occurrences, evidence of similar incidents occurring after the plaintiff's accident also are admissible. The principle was best summarized by the court in *Bass v. Cincinnati, Inc.* , 536 N.E.2d 831, 833 (Ill. App. Ct. 1989), evidence of prior accidents is admissible because it tends to show that a product is dangerous or defective.... It is common sense that the higher the number of accidents involving a product, the more likely it is that the product is the cause of the accidents and is dangerous or defective. It matters little whether the accidents occurred prior to or subsequent to the accident at issue. See also *Caterpillar Tractor Co. v. Beck*, 624 P.2d 790, 794 (Alaska 1981) (holding that subsequent accidents are equally admissible). *General Motors Corp. v. Van Marter*, 447 So. 2d 1291, 1293 (Ala. 1984) (affirming admission where evidence showed different models were "basically the same). See also *Hessen v. Jaguar Cars, Inc*., 915 F2.d 641 (11th Cir. 1990) evidence of a recall campaign on a different model vehicle with a similar defect at issue in pending litigation was held admissible.

In *Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc*., 23 F.3d 1547 (9th Cir. 1994) the Ninth Circuit upheld the trial courts admission into evidence of other similar delamination problems associated with an adhesive used on a different product.   At trial, the district court permitted Western to introduce evidence that NuWa Industries, a Kansas-based RV manufacturer,

used Adhesive on Filon siding and suffered similar delamination problems. The Ninth Circuit concluded that the district court did not abuse its discretion by admitting the evidence. The Ninth Circuit stated that the general rule in federal courts is that "[a] showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as direct proof of ... a design defect." . As the district court noted, in this case "the parallels [between the two incidents] are startling." Western aptly describes the similarities:

Western RV used Black Brothers application equipment to apply Adhesive. So did NuWa [in fact, NuWa used the exact same equipment, purchased from Western]. Western RV applied Adhesive 47344, manufactured by Swift, to bond substrates of the sidewall panels together. So did NuWa. Specifically, Western RV bonded together Filon and fome-cor with Adhesive. So did NuWa. Western RV applied Adhesive to the substrates under the constant guidance and with the constant assistance of Swift's on-site representatives. So did NuWa. And, ultimately, Western RV experienced severe delamination problems, with Adhesive failing to hold its bond with the Filon. And, ultimately, so did NuWa. Although there were minor dissimilarities between Western's and NuWa's experience, the district court certainly did not abuse its discretion by admitting the evidence. *See, e.g.,* 29 Am.Jur.2d *Evidence* § 299 (1967) (evidence admissible despite "some dissimilarity of condition with respect to a matter which cannot reasonably be expected to have affected the result.

In our case, as with *Swift Adhesives*, the manufacturing process, procedures, standard, quality assurance, tire building machines and equipment

for the subject tire is  substantially similar  to the that of the other similar incidents in this case.

Again the Ninth Circuit affirmed the admissibility of other similar incidents in the case of *White v. Ford Motor Company,*  312 F.3d 998 (9th Cir.  2000).  In *White* the defect was in the parking brake, specifically the spring that helps the pawl engage properly between the teeth was not up to specification. Ford argued that evidence of other such rollaway failures was not similar because the defect was an out of specification manufacturing defect and not a design defect. The court held this contention to be disingenuous.  *Id* at 1009.

In *Shafer v. Wal-Mart Stores, Inc.,*  1999 WL 197238 (9th Cir. 1999) (unpublished opinion) the Ninth Circuit affirmed the admission into evidence of accident reports of other similar accidents where an object fell on a customer. In up-holding the admissibility of these other similar incidents, the Ninth Circuit stated they were relevant to whether Wal-Mart could foresee that its method of stacking merchandise on risers posed a risk to its customers. The Ninth Circuit cited *Pau v. Yosemite Park and Curry Co.*, 928 F.2d 880, 889 (9th Cir. 1991) in support of its holding.

In *Bado-Santana v. Ford Motor Company*, 2005 WL 757223 (USDC Puerto Rico), Defendant Ford's motion in limine to exclude evidence of other accidents, lawsuits or claims was denied despite the fact that Plaintiff, at the time of the motion in limine hearing, had produced no facts showing substantial similarity between the subject accident and the other similar accidents. In denying Ford's motion to exclude other similar incident evidence the district court

went through the following reasoning. First, evidence is considered as relevant when it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. of Evid. 401. However, even relevant evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Fed. R. of Evid. 403. Under this rule, the Court has "considerable latitude in determining whether to admit or exclude evidence". *Santos v. Sunrise Medical,* 351 F.3d 587, 592 (1st Cir., 2003) citing *Espeaignnette v. Gene Tierney,* 43 F.3d 1, 5 (1st Cir.1994).However, "[b]ecause Rule 403 requires the exclusion of relevant evidence, it is an extraordinary measure that should be used sparingly." *Campbell v. Keystone Aerial Surveys,* 138 F.3d 996, 1004 (5th Cir., 1998) quoting *United States v. Morris,* 79 F .3d 409, 411 (5th Cir., 1996) *citations omitted.*

In *Bado-Santana* the Plaintiffs sought to present to the jury evidence as to prior accidents to establish Ford was on notice the 1996 Ford Explorer had stability problems and/or its seatbelt, the RCF67, was subject to inertial unlatching. The district court  re-stated the applicable law that the substantially similarity doctrine allows a party to present in evidence prior accidents involving the defendant in order to demonstrate "notice, magnitude of the danger involved, the [party's] ability to correct a known defect, or the lack of safety for intended use. See also *Trevizo v. Astec Industries, Inc.,* 751 P.2d 980 (Ct. App. Az. 1988),

(Arizona appeals court held that evidence of other accidents at other plants caused by the expansion of polyurethane from heating was admissible, reasoning that the evidence was admissible to show Astec was aware of the risk).

In *McCathern v. Toyota Motor Corp*., 23 P.3d 320 (Or. 2001) the Supreme Court of Oregon held that allowing into evidence the details of fifteen other rollover accidents involving SUVs, offered only to provide foundation necessary to explain expert's opinions, was not hearsay evidence and not an abuse of discretion.

Oregon Rule of Evidence 703 is worded exactly as Federal Rule of Evidence 703 and  specifies some types of information on which an expert witness may rely for his or her opinion testimony. One source of information provided by Rule 703 is facts or data that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Although the rule specifically provides that such evidence "need not be admissible," Rule 703 does not render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion.

The *McCathern* court stated that nevertheless, we hold that the trial court did not err when it overruled Toyota's hearsay objections, because plaintiff offered the evidence of the details surrounding the 15 other rollover accidents only to provide the foundation necessary to explain Wallingford's opinions, not for its truth. The trial court admitted the evidence solely for that purpose.

Consequently, by definition, that information was not "hearsay." (an out-of-court statement offered to prove truth of matter asserted); *see also Oberg v. Honda Motor Co.,* 316 Or. 263, 269-70, 851 P.2d 1084 (1993) (excerpts of documents read to jury admitted for limited purpose that defendants had notice of defective design and not for truth were not hearsay), *rev'd on other grounds sub nom *71 Honda Motor Co. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).

In *Smith v. Beech Aircraft Corporation*, 1999 WL 274515 (9th Cir. Ariz.) (unpublished opinion) the Ninth Circuit affirmed the Arizona district court's admission into evidence of other similar incidents even though after vigorous briefing and an evidentiary hearing  the district court could not determine the precise nature of the accident in the case and decided to let the jury decide if the subject accident occurred in the same way as the other accidents.  The district court gave appropriate limiting instructions and special interrogatories indicated that the jury did find the other accidents did occur in the same way as the subject accident.

In *McEwen v. Wal-Mart Stores*, 975 S.W.2d 25 (Tx. Ct. App. 1998) the Texas court of  appeals held the trial court committed reversible error in excluding a prior accident report from evidence.  The appeals court stated the accident happened in the front of the store on a floor mat and as such need only be similar not identical. The appeals court held that the instrumentality was

substantially similar even though the reasons for tripping over the floor mats were different.

### III.     The causes of tire failure due to tread separation:

A tread separation is a specific type of tire failure where the tread and outer steel belt peel off the tire due to a separation in the rubber, usually between the steel belts. Outside the context of litigation, CTNA classifies a tread separation as a defect in material or workmanship, with a return to the consumer of money or a replacement with new tire. Outside the context of litigation a tread separation is distinguished from a failure caused by maintenance (low air) or road hazard (impact) with no such refund. As stated by CTNA's tire adjustment personnel as well as CTNA's own internal documents, if a tread separation is caused or contributed to by maintenance or road hazard, there will be signs present on the tire which will prevent the adjuster from giving the consumer a refund or replacement tire.

Defendant tire manufacturers' experts say a tread separation is the most common failure mode for all tire companies. Defendant's experts say that a tread separation is usually caused by user maintenance or abuse or road hazard. This contention, however, is not supported by CTNA's own adjusters as no money is given back for maintenance or road hazard and as stated by CTNA's own adjustment personnel, very few tires are seen with both underinflation and tread separations and very few tires are seen with both impact damage and a tread separation.

IV.     **Evidence of Other Similar Incidents involving Substantially Similar tires in this case:**

In this case the Plaintiffs' expert Robert Ochs has stated that the skim stock compound FB170 was a defectively designed rubber compound and had insufficient adhesion qualities to hold the subject tire together. The skim stock is the rubber compound which coats the steel belts and which has special chemical properties which allows the rubber to adhere to the steel belt wire.

Given the allegation that the FB170 skim stock compound was defectively designed, the evidence of whether there was a tread separation problem at CTNA involving the FB170 belt rubber compound is most relevant in this case. Were there numerous other tread separation accidents at CTNA involving the same FB 170 belt rubber compound? Were there numerous tread separation pre-accident failures at CTNA involving the same belt rubber compound? What do CTNA's own documents show? What do CTNA's own employees say?

It is without question that adjustment records, lawsuit records claims records, NHTSA defect investigation records, and CTNA internal documents and records are highly probative and relevant to the following questions of fact in this case.

- Did CTNA know (or should they have known) of a tread separation problem?

- Does the post sale performance data as reflected in Warranty Adjustment records track pre-accident tread separation failures with such sufficiency that CTNA knew or should of known of its tread separation problems?

- Are there other claims and lawsuits for tread separation failure of same and similar model passenger tires with same defective FB170 rubber compound?

- Did the Big O tire silent recall involve tires that failed from tread separations having the substantially similar FB170 skim stock compound?

- Did the NHTSA defect investigation of the Ameri-series tires involve the same problem with tread separations and involve the substantially similar FB170 skim stock compound?

- Was the durability committee formed by CTNA because of an abnormally high incidence of tread separations involving the FB170 skim stock compound?

- Does CTNA's own internal documents reflect that sub-standard manufacturing practices was also contributing to an increased incidence of tread separations in tires using the FB170 skim stock compound?

- Does CTNA's own internal documents indicate that it was technically and economically feasible to cure or improve the problem it was having with tread separations?

- Does CTNA's own design documents indicate that the subject tire should have been designed with an increased thickness of the belt edge rubber?

- Does CTNA's own documents reflect that nylon cap strips were used on some tires identical to the subject tire but not used on the subject tire?

- Does CTNA's own internal design documents reflect that CTNA proposed, then rejected, then later adopted belt edge wraps for use on the subject tire?

- What are the costs associated with increase belt rubber thickness, of adding belt edge wraps, of adding nylon cap strips, of improving manufacturing and quality control practices?

- What did CTNA do to solve or improve the problem of tread separations?

- Did CTNA's silent recall recall of Big O tires in southwest improve the problem it was having with tread separations?

- Did CTNA's own belt edge durability committee identify possible causes of the tread separation problems but disbanded without attempting any solutions?

- Did CTNA attempt to make any plant or manufacturing practice modifications?

- Does the documentary evidence indicate that CTNA continued to have problems with tread separations in passenger tires that used the FB170 until the time the FB170 compound formula was changed in 1997?

The answers to the above questions of material fact at issue in this case are contained in the exact documentary evidence of other similar incidents data that CTNA seeks to have this court summarily exclude in its motions in limine.

Dated this 17th day of August, 2005.

WILLIAM S. FRATES, II, P.A.

By: /s/ William S. Frates
      William S. Frates, II
      FL Bar No.: 107898
      Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 17, 2005, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Graeme Hancock, Esq.
Lawrence E. Palles, Esq.
Fennemore Craig
3003 North Central Avenue
Suite 2600
Phoenix, AZ  85012-2913
ghancock@fclaw.com
mreimann@fclaw.com

C. Vernon Hartline, Jr., Esq.
Scott Edwards, Esq.
Hartline, Dacus, Barger, Dreyer & Kern
6688 N. Central Expressway, Suite 1000
Dallas, Texas 75206-3900
hartline@flash.net

Thomas F. Dasse
Law Office of Thomas F. Dasse, P.C.
14646 N. Kierland Blvd., Suite 235
Scottsdale, AZ  85254
tdasse@dasselaw.com
jtomlinson@dasselaw.com

/s/ William S. Frates, II
William S. Frates, II