WILLIAM S. FRATES, II, P.A.
William S. Frates, II
830 Azalea Lane
Vero Beach, FL 32963
Tel: (772) 231-5896
FBN 107898
Email: billf@frates.com

THOMAS F. DASSE
14646 No. Kierland Blvd., Suite #235
Scottsdale, AZ 85254
Tel: (480) 998-8222
Email: tdasse@dasselaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ALFRED GONZALEZ, as personal representative of The Estate of MARTIN E. GONZALEZ, Deceased, and ALFRED GONZALEZ, individually, and for the benefit of MARY L. GONZALEZ, as surviving parents of MARTIN E. GONZALEZ, Deceased,<br><br>      Plaintiff,<br><br>v.<br><br>CONTINENTAL TIRE NORTH AMERICA, INC., F/K/A/ CONTINENTAL GENERAL TIRE, INC., an Ohio Corporation,<br><br>      Defendant, | CASE NO. CV00-611 TUC (JM)<br><br>**PLAINTIFFS' FIRST SUPPLEMENTAL MEMORNDUM IN OPPOSITION TO CTNA'S MOTION IN LIMINE RE: ADMISSIBILITY OF ADJUSTMENT DATA OF SUBSTANTIALLY SIMILAR TIRES** |

The Plaintiffs, above-named, by and through its undersigned counsel, files this their First Supplemental Memorandum in Opposition to CTNA's Motion in Limine Regarding Admissibility of Adjustment Data of Substantially Similar Tires as follows:

**The Motion**

Defendant CTNA seeks by its Motion in Limine to prevent Plaintiff from introducing into evidence any testimony or documents regarding warranty "adjustments" of other similar steel belted radial passenger tires made by it that have experienced the exact same mode of failure (a tread separation) in the exact same component part (the steel belt rubber), in tires that were all made with the same belt rubber formula (FB170) – a formula that Plaintiff's tire expert has testified was shown by CTNA's own testing, as well as incredible numbers of subsequent real world tread separation failures, to be defective.

**The Law**

The law regarding the admission of evidence of failures of other tires made by Defendant is generally that they must be shown to have "substantial similarity" to the subject situation; otherwise they would not be relevant. As set forth extensively in Plaintiff's companion brief regarding the law on this issue, the question of what is substantially similar depends on the issues presented in the case. It is not necessary to show identical product models, or even similar models, so long as there are other substantial similarities. Substantial similarity may be shown if the products have similar failure modes or similar components. The purpose for the evidence is also important in determining how similar the products must be for admissibility. Since this law applies to the introduction of evidence regarding similar accidents, claims, lawsuits, and complaints, as well as to adjustment data, it is submitted by separate brief, but incorporated for all purposes herein. Although all of the same arguments apply to other similar

claims, lawsuits, accidents and complaints, CTNA has alleged a special additional case for adjustment data, which it claims makes it inadmissible in evidence, even if the data were considered to be about substantially similar matters. This brief therefore, addresses the issue specifically as it relates to adjustment evidence.

**The "Adjustment" Euphemism**

In the tire industry the euphemism "Adjustments" is used in place of its rightful name – "Warranty Defect Replacements" or "Warranty Defect Returns". This process involves a customer returning a tire to a dealer when it fails to perform properly, and receiving either a new tire or a discount on a new tire.[1]

**The Warranty**

A written warranty is given with every tire purchase. Although it generally provides no more remedies than the common law, it does clarify the rights and responsibilities of the buyer and seller and avoids litigation of numerous claims for tire replacement. The warranty in this case is typical. It sets forth specifically what conditions will be covered (allowed) and which will not. (Exhibit _) The bottom line for coverage is that the tire will be covered under warranty if the condition of the tire is due to a materials or workmanship defect; it will not be covered if the customer caused the problem, either through lack of maintenance

---

[1] The amount of the discount is based on the tread depth remaining.

or contact with a road hazard. In other words, if the problem is the fault of the tire company it is covered. If it is the fault of the customer it is not covered.[2]

**The Tread Separation Warranty**

A tread separation, (the condition of the subject tire) is always covered under the warranty; it is treated by Continental as well as all other major tire companies (outside the litigation arena) as a workmanship and materials defect. The customer with a tread separation receives a new tire. Tread separations are generally fatigue failures, that progress from small areas (usually at the belt edges) to total belt leaving the tire carcass catastrophic failures during highway speed operation. They often, but not always, cause some ride disturbance before they fail completely. They may also show bulges in the tire, or wire sticking through the tire, with or without a ride disturbance. When they manifest themselves before a sudden catastrophic failure, they result in warranty defect adjustments; when manifest themselves suddenly, they can result in massive injuries or deaths, as in the instant case.

**The Procedure**

The procedure set up by the tire company to handle warranty defect "adjustments" is as follows. The customer brings the defective tire to the dealer with one or more complaints. The dealer examines the tire (as it was trained to do by the tire company) and initially determines the problem. As noted above, if

---

[2] There is an additional type of warranty called a "road hazard" policy, but that kind was not in effect in this case. That type is a kind of insurance policy that does cover problems caused by road hazards, regardless of how they were caused. It typically is purchased for an extra amount at the time of the initial tire purchase.

the dealer determines that there is a problem, and that the problem was caused

by the customer's use of the tire, it will refuse to replace the tire under the

warranty program. If the dealer determines that the tire problem was not caused

by its use, it will replace the tire under the warranty. The conditions for

replacement are not arbitrary. The dealer replaces the tire and then sends the

faulty tire to the tire company, along with the required paperwork. At that point, a

professional tire adjuster (a full-time employee of the tire company) inspects the

tire to determine if the problem initially identified by the dealer was correct. If it is

not, there is a system of accounting disallowances made with the dealer. If, as is

typical, the right reason was identified for the warranty return, then the

information is entered into the tire company computers and the "adjustment" is

verified; that is, the dealer will receive money from the tire company.

**The Adjustment Databases**

Warranty adjustment records are kept primarily in the tire company's databases,

on mainframe computers. The database fields include tire type, make and model,

size, line, DOT number, date and plant of manufacture, reason for the return and

disposition, and many other things considered important by the tire company.

There is typically someone in charge of collecting this data. In this case the

person in charge of administering Continental's warranty program was Ronald J.

Forsyth, whose title was National Manager of Product Service and Consumer

Relations. The actual warranty adjustment inspections were done by James F.

Clark, Jr., and Dillard Eller in Charlotte, North Carolina. The reports generated

from these databases are utilized by many departments. One of the most

important utilizations in this case was by the Central Quality Assurance

Department. The person in charge of this area at the relevant times was Hector

Espinal, whose title was Manager for Quality Systems and Field Engineering.

**The Adjustment Records Are Used by Continental to Identify Defects**

The computer records showing details of the warranty returns are universally

kept by tire companies, for a number of reasons. First, and foremost, is that they

are required to be kept by the government. Additionally, all tire companies

identify how their tires are performing in the real world, in part by use of these

records of defective tires returns. They are used to highlight which tire lines are

having higher rates of warranty returns, which manufacturing plants might be

having more problems, which machines or processes are better or worse, which

quality control programs need improvement, and for a number of other purposes.

In this case Continental's computers were set up to print out "Trigger Reports"

when problems occurred in numbers that it thought were excessive. It would be

negligent for any tire company not to try to determine and control product

performance, and the analysis of adjustment data is one of the primary ways

used by all tire companies.[3]


Espinal deposition p 213

```
8   A.  I'm also happy that your technical group now has the
9       capability to use the on-line data base to track
10      adjustment information on a regular basis.  I am
11      positive that this new resource would further increase
12      the effectiveness of your adjustment improvement
```

---

[3] Indeed, in the 2000 Firestone Recall, the company stated that it was mislead by relying only on its adjustment data, and neglecting to utilize its records of accident claims.

13      action plans.  The timely use of data is essential to
14      making the right decisions, and in the past we made
15      some blunders because our adjustment data base was
16      poor or nonexistence.

Espinal in Lampe

13:46:21 6   Q.    Okay.  So then you would agree with
13:46:23 7   me, sir, that to the extent that we want to track
13:46:25 8   the performance of tires built end of the year '92
13:46:28 9   and put into service 1993, that five-year window
13:46:33 10   would be from 1993 -- 1993 through 1998, correct?
13:46:40 11        A.    We don't do it that way.  The reason
13:46:42 12   we don't do it that way is we track adjustment from
13:46:46 13   the day the tire is manufactured.  Normally it's
13:46:49 14   very difficult to tell when a tire goes into usage
13:46:52 15   so we do it from the date of manufacture.
13:46:53 16        Q.    So five years from the date of
13:46:55 17   manufacture, correct?
13:46:55 18        A.    Five years and current.
13:46:57 19        Q.    That would be the optimal time frame
13:46:59 20   to be able to look at to see how the tire is
13:47:02 21   performing?
13:47:02 22        A.    That's how we keep the data in the
13:47:06 23   database.

Forsyth deposition

14      Q.    So you can break it down by tire
15   condition in terms of each year that the tires
16   are returned, you can show what conditions
17   they're being returned for?
18      A.    We can do that, yes.

Grant deposition in Guillen v BFS p 22

          But I pretty much understand how most
15   tire manufacturers work.  The claim -- if you get a
16   claim it ends up going in your adjustment system.
17   And claims are, you know -- excuse me -- claims
18   compared to the overall adjustments that you get
19   are very typically a very small percentage.  So as
20   long as your looking at and following your
21   adjustment systems -- and that's really what we
22   look at -- that pretty much covers your claim also.

**Adjustment Records Are Used by the NHTSA to Identify and Investigate Defects for Recall Purposes**

The National Highway Traffic Safety Administration (NHTSA), U.S. Department of Transportation, is the federal agency responsible for issuing and enforcing safety standards concerning the manufacture of motor vehicles and motor vehicle equipment, and for investigating alleged defects in those vehicles and equipment. The Safety Act requires a manufacturer who determines that a safety-related defect exists in its vehicles or equipment to notify purchasers of safety-related defects and to remedy the defect, which is commonly known as a recall.[4]  However, the public is not left solely at the mercy of the manufacturer to make a safety defect determination.  The statute also gives NHTSA the authority to investigate defects[5], and to require manufacturers to recall when NHTSA finds that the vehicle or equipment contains a safety-related defect.[6]

NHTSA, recognizes the significance of adjustment data as a means of tracing defective tires in the consumer marketplace.  In a January, 1980 initial defect determination letter, document C9-19-1.48a, NHTSA stated;

---

[4] A manufacturer of a motor vehicle or motor vehicle equipment is required by 49 U.S.C. §30118(c) to notify the Secretary . . . and owners, purchasers and dealers of the vehicle or equipment as provided in section 30119(d) of this section, if the manufacturer - (1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety.

Pursuant to 49 U.S.C. § 30165, a manufacturer who violates these statutory or regulatory provisions is liable to the Government for a civil penalty.

[5] 49 U.S.C. § 30166.

[6] 49 U.S.C. § 30118(a), (b).

> Adjustment data can provide perhaps the most accurate picture of whether a manufacturer's tires pose an unacceptable risk to safety, and if so, pinpoint which group of tires are faulty.  A preliminary analysis by the NHTSA staff of extensive adjustment data identified certain tires which warranted further investigation.

NHTSA further stated that the leading cause of failure reported by consumers to NHTSA are separations and blowouts occurring at an average mileage of 10,500 miles.  (NHTSA ODI Report, Section V. Observations, paragraph 1.  1980).

**Continental's Warranty Defect Adjustment Arguments in Litigation**

Contrary to its actual practice in non-litigation day-to-day business, Continental takes a very different course in product liability litigation. It has skillfully crafted the audacious argument that adjustments are not necessarily defects, but rather are simply a vehicle for spreading goodwill to its customers – despite the express language to the contrary in the written warranty. The purpose of this argument is a transparent attempt to prevent their introduction into evidence. It has its own employees and experts testify that adjustments are not really defects, and then argues that the issue should be taken from the jury, despite Plaintiffs' expert testimony and record evidence to the contrary. A more through examination of Continental's arguments is clarifying.

**The "Tread Separations Adjustments Do Not Indicate Defects" Argument**

This argument has been made by tire companies to the Department of Transportation's National Highway Transportation and Safety Administration (NHTSA), which is in charge of regulating vehicle safety, including tires. It has been rejected. As part of the recent Firestone recall, NHTSA's Office of <u>Defect</u> Investigations (emphasis supplied) published a report stating as follows:

Firestone asserts that a tread separation is one of the most common failure modes for any steel-belted radial tire, regardless of brand. It contends that all radial tires can experience tread separations for a variety of reasons related to use, such as low inflation pressure, a slow leak, an impact break, or a similar incident.

<u>Firestone's contention that a tread separation is not a defect is inconsistent with its defect determination of August 2000, and with several other safety-related determinations that it made before and after August 2000 (Table 4)</u> [42] ODI recognizes that such factors as road hazards and severe under-inflation can contribute to tread separations. However, such failures would occur randomly throughout the tire population and would not yield the age-dependent failure distributions that are evident in the recalled tires and in the focus tires. 42 **Other tire manufacturers have also made safety defect determinations and conducted safety recalls to address tread separation problems. There have been 38 such defect recalls conducted by other tire manufacturers since 1985**.

*Engineering Analysis Report and Initial Decision Regarding EA00-023: Firestone Wilderness AT Tires.* U.S. Department of Transportation National Highway Traffic Safety Administration Safety Assurance Office of Defects Investigation October 2001. (emphasis supplied)

Additionally, NHTSA has removed any doubt about its position on this matter with

the pronouncement in the recent Tread Act:

Far more useful for analysis of potential **defect** trends is the tire manufacturer's **adjustment (warranty)** and claims data. The adjustment and claims data contain complete  identification of the tire make, model, build plant type, and date of production. We have received such data in response to information requests issued during our **defect** investigations and find that these data are far superior than that contained in complaints**.[7]** (emphasis

---

[7] 66 FR 66190-01, 2001 WL 1635633 (F.R.)
PROPOSED RULES
DEPARTMENT OF TRANSPORTATION
National Highway Traffic Safety Administration
49 CFR Parts 574, 576, 579
[Docket No. NHTSA 2001-8677; Notice 2]
RIN 2127-AI25

supplied)

Other federal agencies have also defined "adjustment" in a similar

manner.

> Title 33
> ENVIRONMENTAL QUALITY
> Part VII. Solid Waste
> Subpart 2. Recycling
> Chapter 105. Waste Tires
> §10505. Definitions
> A.
> The following words, terms, and phrases, when used in conjunction
> with the Solid Waste Rules and Regulations, shall have the
> meanings ascribed to them in this Section, except where the
> context clearly indicates a different meaning.
> * * *
> "Adjustment Tire" a tire that becomes unusable for any reason
> **within the manufacturer's control** and is returned to the dealer
> under a tire warranty by the tire manufacturer. Tire adjustments are
> initiated by the consumer. (emphasis added)
> * * *
> "Recall Tire" a tire that is specified **as defective** by the
> manufacturer and returned to the dealer so that the dealer may
> provide a replacement or repair. Recalls are initiated by the
> manufacturer. (emphasis added)
> * * *
> AUTHORITY NOTE:
> Promulgated in accordance with R.S. 30:2411-2422.
> HISTORICAL NOTE:
> Promulgated by the Department of Environmental
> Quality, Office of Solid and Hazardous Waste, Solid Waste
> Division, LR 18:37 (January 1992), amended LR 20:1001
> (September 1994), LR 22:1213 (December 1996), amended by the
> Office of Environmental Assessment, Environmental Planning
> Division, LR 26:2773 (December 2000), LR 27:829 (June 2001), LR
> 27:2226 (December 2001), LR 28:1953 (September 2002), LR 29:

---

Reporting of Information and Documents About Potential Defects Retention of
Records That Could Indicate Defects
Friday, December 21, 2001
***66190*** AGENCY: National Highway Traffic Safety Administration (NHTSA), DOT.

Even the Internal Revenue Service has no doubts that tire adjustments indicate defects.

> Tires; adjustment under warranty. A method is set forth for computing the credit or refund of tax allowable to a manufacturer that makes price adjustments under its warranty on replacement tires sold to dealers to replace defective tires bearing its brand label, or sold under the dealer's brand label and replaced with tires of another manufacturer, with the dealer's account being credited for the adjustment. No credit or refund is allowable, however, with respect to tires sold to dealers at a price reduction in lieu of warranty. (emphasis added) Rev. Rul. 76-423 1976-2 C.B. 345 Section 4071 -- Tax on Tires and Tubes. Caution: Modified by Rev. Rul. 77-390 IRS Headnote

Continental is included in the list of tire manufacturers that have instituted recalls of defective tires due to tread separations.[8] (Ex. 1) In each recall Continental sent

---

[8] NHTSA# 78T026000 - THE INVOLVED TIRES FAIL TO MEET THE ENDURANCE REQUIREMENTS OF FEDERAL MOTOR VEHICLE SAFETY STANDARD NO.109, "NEW PNEUMATIC TIRES". TREAD SEPARATION MAY DEVELOP AND LEAD TO PREMATURE FAILURE.

NHTSA# 00T002000 - TIRE DISCRIPTION: CERTAIN TIRES MANUFACTURED BETWEEN 10-31-99 AND 11-9-99 WERE PRODUCED WITH A NON-SPECIFIED RUBBER COMPOUND IN THE BELT AREA. COULD CREATE RISK FOR POTENTIAL TIRE FAILURE.

NHTSA# 85T010000 - TIRES FAILED TO MEET THE ENDURANCE TEST REQUIREMENTS OF FMVSS NO. 119. CONSEQUENSE OF DEFECT: FAILURE OF ENDURANCE TEST MAY LEAD TO TREAD SEPARATION AND LOSS OF AIR PRESSURE.

NHTSA# 88T007000 - TREAD SEPARATION DUE TO HIGH INFLATION PRESSURE WHEN USED AT SLOW SPEED AND NOT REDUCED FOR HIGHWAY SERVICE.

NHTSA# 90T009000 - SEPARATION MAY OCCUR IN THE TREAD, CAUSING A BREAKDOWN OF SUBASSEMBLY AREAS IN THE TIRE. THIS COULD CAUSE TIRE FAILURE AND COULD RESULT IN AN ACCIDENT.

NHTSA# 02T011000 - THESE TIRES, UNDER HIGH SPEED, HIGH LOAD, AND HIGH AMBIENT TEMPATURES, CAN EXPERIENCE PORTIONS OF THE TREAD RIB RUBBER TO SEPERATE FROM THE TIRE CARCASS. UNDER THESE CONDITIONS, THE DRIVER COULD LOOSE CONTROL OF THE VEHICLE POSSIBLY RESULTING IN A VEHICLE CRASH.

NHTSA# 02T012000 - THESE TIRES HAVE LOWER THAN SPECIFIED RUBBER GAUGE BETWEEN THE BELT EDGES. THESE CONDITIONS CAN POTENTIALLY LEAD TO TREAD DETACHMENT OR SEPARATION. SHOULD THE TREAD SEPARATE FROM THE TIRE

a letter to the customer stating that, **"CTNA has decided that a defect, which relates to motor vehicle safety exists…"** as a result of which **"a belt separation may occur** that could cause a section of the tread and belt package to detach from the tire casing which could cause minor vehicle damage or a vehicle crash." (Exhibit 2)

**The Goodwill Argument**

Just because a tire company says it is accepting warranty tire returns for goodwill does not make it so. There is ample evidence to the contrary.

1. A true goodwill adjustment would be an all risk, road hazard type of warranty that is similar to an insurance policy. These types of warranties are sold or supplied by some tire companies for some tires, but usually cost more. The subject warranty was NOT one of those "road hazard" warranties. Those would clearly confer the most "goodwill", as they would always be honored.

2. The actual warranty supplied in this case specifically EXCLUDES DAMAGE CAUSED BY THE USER. While making good economic and legal sense, it is not the best way to maintain good customer satisfaction. Charlotte Ex 65.

---

CARCASS, THE DRIVER COULD LOOSE CONTROL OF THE VEHICLE POSSIBLY RESULTING IN A VEHICLE CRASH, PERSONAL INJURY OR DEATH.

## 4. WHAT IS NOT COVERED BY THE ADJUSTMENT POLICY

### a. Non-Adjustable Conditions—

*Road Hazard*—Cuts, snags, punctures, bruises or impact breaks and any damage caused by puncture or tire repair.

*Ride/Vibration*—After "free replacement period" (set forth in section 2A).

*Tire Damage or Failure Resulting From Improper Operation or Maintenance*—Load, speed, and inflation practices causing excessive operational temperatures to exceed the tire capabilities.

*Tire damage (including irregular treadwear) or failure resulting from:* improper mounting or demounting, damaged rim, wheel alignment, tire trueing, chain damage, brakes or any similar mechanical problem, extreme temperature exposure, misuse, negligence, abusive driving such as tire spinning, racing or accident damage.

*Tire failure resulting from intentional alteration,* such as adding a white inlay on a blackwall or sealant materials.

*Age Conditions — Weather checking/cracking or failures resulting from such age conditions for tires purchased more than forty-eight (48) months prior to presentation for adjustment. If date of purchase cannot be accurately determined, the date of manufacture (tire serial number) will be used.*

3. USER CAUSED DAMAGE IS EXCLUDED.

Clark depo p 74

```
 7  Q.  Well, you have adjustable and nonadjustable conditions
 8      and basically nonadjustable are things that -- from
 9      misuse or some use of the product that the company is
10       not warranting, right?
11  A.  That's correct.
```

The actual adjustment procedure as evidenced by Defendant's Adjustment

Manual provides for adjustments only for conditions not caused by the user.

Non-Adjustable conditions include:

Rim Damaged (1110)
Bead Damaged/Kinked In Mounting (1111)
Sidewall Rim Bruise Outside, Inside (2020)
Sidewall Curbed, Cut or snagged (2030)
Sidewall Cut by Equipment, Parts or chains (2140)
Alignment, Mechanical, Inflation Wear (3010)
Tread Cut, Torn By Equipment Parts (3140)
Tread Cut, Torn or Peeled From Unimproved roads (3150)
Tread Damaged By Solvents Or Petroleum Products (3334)
Nail Puncture/Penetration (4000)
Bruise/Impact Break (4020)
Cut Thru Carcass (4030)
Puncture – Temporary Repair (4032)
S-shaped distortion, Cut Induced (4187)
Underinflation/Overload (4240)

4.  The law of all states provides that a manufacturer is liable for products that are defective in material or workmanship when made. Warranties are simply a cost effective and speedy method of resolving claims when customers return tires with complaints (as defective).

5.  It strains common sense (and perhaps SEC rules) to think that a publicly owned tire company gives money away for failure of products that do not contain any defects.

6.  All tire companies have similar motives for maintaining warranty adjustment programs, and Plaintiff's tire expert as well as defendant's own employees have offered testimony that customer satisfaction is NOT the sole, or even the main, reason for them.

7.  Testimony and documents in this case show that adjustment data is used for the purpose of tracking the real world performance of tires, including making changes to design, materials and workmanship to correct or reduce problems with tread separations – the most common safety problem.

8.  Documents and employee testimony also show that adjustments are tracked by CTNA in order to reduce costs and improve the bottom line.

<u>(Charlotte Ex 77)</u>

10  Q.   And with regard to plant chargebacks, what was the
11        basic purpose of that?
12  A.   Once again, the plant chargeback provides the plants
13        with the units and the costs associated with the

14      adjustments that have been received in process.
15  Q.   So working in conjunction with the plant chargeback
16      reports and the trigger reports, you were seeking to
17      save money, is that correct?
18              MR. TRENT:  Object to form.
19  A.   Well, the primary thrust of what we're dealing with
20      here is to improve product performance.  It turns out
21      that that also reduces the adjustment cost, yes.
(Espinal p 210)

9.   Adjustments were used by CTNA as the basis for "Trigger Reports" – a
     procedure for monitoring manufacturing problems. (Espinal depo p201)

1  Q.   And again, given this time frame of early 1993, this
2      is in the date area where you were developing this
3      particular program, is that correct, the trigger
4      report program?
5  A.   Correct.  As I mentioned before, I don't know whether
6      it goes into 1992 time frame, but it certainly was
7      there in that general time back in 1993.
8  Q.   And looking at the first paragraph it states:
9      Attached please find the subject report for January
10     '93.  The trigger report highlights the tire size,
11     design, and plant.  The manufacture of any product
12     code was adjusted performance level after 12, 18, or
13     24 months field exposure.  It was above our
14     recommended performance bogeys.
15          And that's a paragraph that you authored, is that
16     correct?
17  A.   Correct.
0202
2  Q.   The second sentence, second paragraph:  This early
3      warning system is designed to alert all concerned
4      parties of any potential field problems for the
5      purpose of taking prompt, corrective, actions.
6          And that was your purpose in developing this, is
7      that correct?
8  A.   Correct.

10. Self-serving testimony by tire company litigation experts regarding the
    purpose of adjustments should not be controlling.

**The "Liberal" Adjustment Argument**

Continental further argues that to keep customers and dealers satisfied,

adjustment programs are liberally administered by tire manufacturers. Again, this

is argument, not fact. The inference is that Defendant ignores the facts presented

by each tire, or allows the payment of money (or a discount on a new tire) even

though the defect in the tire was caused by the user – or not caused by materials

and workmanship. The evidence is contrary.

1. The testimony of Defendants' adjustment personnel is that all tire
   adjustment conditions are recorded by them exactly as they are found.
   The code is not changed.

Clark Depo P 114

```
14  Q.  To the extent that you put the stamp of "adjustable"
15      on a tire, that is something that is a cost factor for
16      your company?
17  A.  That's true.
18  Q.  If there are less tires that are classified as
19      adjustable, in effect, the company would make more
20      profits, would you agree?
21  A.  I don't work under that condition.  I work on a black
22      and white.  It's either adjustable or nonadjustable,
23      and I don't see any cost factors or anything, you
24      know, relating to, you know, company profit or loss.
25  Q.  Whether it affects profits or not, you're concerned
   Mr. Clark                            115
 1      with making sure that you classify the tire
 2      appropriately?
 3  A.  The tire is done right.  It's adjusted right whether
 4      it's black or white.  It's either adjustable or
 5      nonadjustable, and I have no -- I lean neither to the
 6      company or nor to the customer.

 7  Q.  All right.  No-nonsense approach, just you're going to
 8      call it the way you see it?
 9  A.  It's straight down the road.
10  Q.  And you feel that you do your job accurately?
11  A.  If I didn't, I wouldn't be working there.
12  Q.  And you feel that you have sufficient time to do your
13      job accurately?
14  A.  I do.
```

2. There is a specific code for "goodwill" or "customer satisfaction". It was not

used for ANY of the tires listed as "tread separations" or tread durability.

<u>Clark Depo</u>

```
 7  Q.   Well, you have adjustable and nonadjustable conditions
 8       and basically nonadjustable are things that -- from
 9       misuse or some use of the product that the company is
10       not warranting, right?
11  A.   That's correct.

19  Q.   That business-related customer satisfaction thing,
20       does that category 8000 also include anything else
21       besides tires that you find nothing wrong in?
22  A.   Just shipping damage.  There's shipping damage in
23       there.
24  Q.   Okay.  So if we're looking at the codes for 800 --
25       excuse me -- for 8000, we're going to see not only
```

Mr. Clark                                    75

```
 1       tires that you didn't find anything wrong in, but
 2       we're going to find tires that may have had some
 3       shipping damage?
 4  A.   Correct.
 5  Q.   Are we going to find any other categories?
 6  A.   No, sir.
 7  Q.   Now, if you find a tread separation, you're not going
 8       to code it 8000, are you?
 9  A.   No.
```

3. Defendant "trains" its dealers NOT to return tires for adjustment if the defect is caused by the user.

4. CTNA said in April 1993 that toward the goal of reduced costs and improved bottom line, it "has an active program for inspecting returned tires and <u>reducing</u> technical adjustments". "I am happy to report that as of April 1, 1993, sales management has already eliminated some of the policy adjustments shown in the report." (Charlotte Exhibit 77)

**The "Our own adjusters are not tire experts" argument.**

This argument by Continental is just incredible. Despite the fact that all of the

company's passenger tire adjustments are done in Charlotte, by three men (two

of whom were deposed in this case) Continental says they are not qualified tire

experts. They are certainly expert enough to cost (or save) the company millions

of dollars by their work. Yet, when it comes to litigation, they don't measure up.

Once again Continental argues that this forecloses further consideration.

Mr. Clark (and Mr. Eller) themselves think that they are qualified to determine the

cause of tire failure. In fact, they are the two most experienced men in this

regard, in the entire company. They do it all day long – every day.


Clark Depo p 22

    13   Q.   We've gone through with Mr. Forsyth and added these up
    14        and they come out to about 250 separate conditions, do
    15        they not?
    16   A.   Yes, sir.
    17   Q.   And you've had to learn each of those conditions, not
    18        only the number designation, but you had to actually
    19        be able to spot those conditions on a tire before you
    20        actually could start doing your job, right?
    21   A.   That's correct.
P 107
    16   Q.   So you take whatever time you feel is necessary to do
    17        the job properly?
    18   A.   That's correct.
    19   Q.   On every tire that comes in?
    20   A.   Yes.
    21   Q.   Do you get bonuses based upon your production at all?
    22   A.   No.

p 115
    15   Q.   And if you didn't feel that you had enough time, you
    16        would not agree to try to inspect as many tires over a
    17        period?
    18   A.   That's correct.  I have the option of at my own time
    19        frame to do the tires right.  I mean if we don't do
    20        them right in the beginning, in the end it shows up.

Clark Depo:

Mr. Clark                                 20

     8   Q.   So you learned this job that you do on the job; you

9      were taught by somebody that was in the position
10       before you?
11   A.   Right.
12   Q.   Is that true of the other fellows that work in the
13       same job that you do?
14   A.   They were trained.
15   Q.   Same way that you were, on the job?
16   A.   Yes, sir.
17   Q.   Before you started the job did you have any classroom
18       training where you sat down and were instructed for
19       any particular period of time?
20   A.   We did.
21   Q.   How long was that?
22   A.   I can't remember.  It's been 16 years ago.
23   Q.   Okay.  Where would the -- where were you instructed?
24       Was it at the plant?
25   A.   I have been in the plant.  I've been -- we had classes

Mr. Clark                              21

1      in Atlanta.  We had some in Akron.
2   Q.   What kind of classes were you given?
3   A.   Just to go over -- show us what we were looking for as
4       far as tire adjustment conditions.
5   Q.   Did you see any videotapes?
6   A.   I can't remember.
7   Q.   Did you see demonstrations of actual tires given by
8       experienced people to show you what an adjustable
9       versus a nonadjustable condition was?
10   A.   We see the conditions, yes.
11   Q.   That's presumably how you learned what those
12       conditions were and how to spot them, right?
13   A.   That and on-hands.
14   Q.   But somebody has got to tell you before you start
15       hands-on what the condition is that you're looking
16       for, right?
17   A.   Right.  We have a manual that we go by with the
18       photos.
19   Q.   Okay.  And did you look at each of those conditions in
20       your training before you started to do this job?
21   A.   Yes.
22   Q.   The conditions that you -- that are adjustable -- and
23       adjustable means that the dealer gets some money back,
24       right?
25   A.   Yes.

Mr. Clark                              22

1  Q.   Nonadjustable means that they don't get money back?
2  A.   Right.
3  Q.   Did you go through before you started in your job each
4       of the condition codes so that you would know what
5       they were?
6  A.   Yes, we did.
7  Q.   And a condition code is just a -- in Continental
8       General is a series of numbers or letters and numbers
9       in combination -- it looks like four is the magic
10      length of these numbers -- that each apply to a
11      particular condition, correct?
12 A.   Right.
13 Q.   We've gone through with Mr. Forsyth and added these up
14      and they come out to about 250 separate conditions, do
15      they not?
16 A.   Yes, sir.
17 Q.   And you've had to learn each of those conditions, not
18      only the number designation, but you had to actually
19      be able to spot those conditions on a tire before you
20      actually could start doing your job, right?
21 A.   That's correct.
22 Q.   When you started your job, did you have a period as an
23      apprentice where you had somebody working alongside of

24      you that was experienced?
25 A.   Yes, sir.

       Mr. Clark                          23

5  Q.   And what about the other two fellows that work there
6       now, did they have the same apprentice-type position
7       when they started?
8  A.   Yes.

       Mr. Clark                          24

14 Q.   Without holding you to any specifics, when somebody
15      trained you, Mr. Monroe or whoever it was, are you
16      talking about something that's like a week or two or
17      are you talking something that's a year training?
18 A.   The process is probably six months to a year.
19 Q.   Okay.  During that period of time does the experienced
20      person stay with the inexperienced person and adjust
21      the tires together?
22 A.   No.
23 Q.   How does that work?

24  A.  Well, we're -- our stations -- the two that are
25      working together, their stations are back to back or

Mr. Clark                                    25
1      side by side, and that -- one of them will kind of
2      monitor the other one till, you know, he gets, you
3      know, everything down pat.  So if the other one has a
4      question, you know, he can -- he can just turn right
5      to the other adjuster.
6  Q.   So does it take six months to a year to get it down
7      pat?
8  A.   To learn all the codes and all the policies generally
9      it does.

25  Q.  Okay.  And the actual number of years at doing the job
Mr. Clark                                    114
1      that we're talking about, you're the one that has the
2      most?
3  A.  I am.
4  Q.   So you've seen more tires and adjusted more tires than
5      anyone in your department at this time?
6  A.   That's fair to say.
7  Q.   And that would include Mr. Forsyth and Gerri Harkins?
8  A.   Yes.
9  Q.   All right.  You have told us that you feel experienced
10     and capable of doing your job, is that right?
11  A.   That's correct.

P 122
24  Q.   You can certainly tell the difference, and we've gone
25      through this earlier today, but you can certainly tell
Mr. Clark                                    123
1      the difference between a tire that has adjustable and
2      nonadjustable conditions?
3  A.   That's correct.
4  Q.   And you can certain tell the tire, for instance, just
5      as example, tires that have been driven underinflated
6      or overloaded --
7             MR. MORAN:  Object to the form of the
8         question.
9  Q.   -- versus a tire that has suffered an impact?
10            MR. MORAN:  Object to the form of the
11        question.
12  A.   I can.
13  Q.   And you can tell the different between a tire that,
14      for example, has been driven underinflated or
15      overloaded and one that has a tread separation?

22

16             MR. MORAN:  Object to the form.
17    A.  I can.
18    Q.  You can tell the difference between a tire that has
19        been driven that has an impact damage versus a tread
20        separation?
21    A.  I can.

P 39

20    Q.  All right.  Let's say in a given week, how often would
21        you use -- and I'm not trying to hold you to precise
22        numbers, but in a given week how often would you not
23        be able to determine what's wrong with a tire?
24    A.  Probably one or two maybe.

Additionally, other tire experts in the company (including Continental's

designated expert, Joe Grant) have testified that they have contributed to the

"Adjustment Manual", which contains photographs and descriptions of all of the

various tire conditions encountered.

Clark depo

P 91

15    Q.  Mr. Clark, this document marked as Charlotte Exhibit
16        Number 86 entitled "Photo Reference Guide to Tire
17        Adjustment Conditions," what kind of document is this?
18        What -- how would you describe this
19    A.  It's just the makeup of the tire, certain sections of
20        the tire, what -- bead, tread, whatever.
21    Q.  It's photographs, is it not, of the various conditions
22        that are adjustable and nonadjustable?
23    A.  Yes, it is.

P 92

11    Q.  Do these -- does this document attempt to show every
12        condition, or is it just some of the more important
13        conditions?
14    A.  We cover most of all of them that we have.
15    Q.  Okay.  When there is a photograph of the condition, is
16        it your understanding that that photograph is an
17        example of the type of damage that's being portrayed
18        or that you can only adjust it according to that
19        photograph?  Do you understand what I'm saying?
20    A.  Yes.  That's just a guideline.  It's not a structural
21        thing that we have to go by.  We just get an

23

22      indication of what it would look like.

P 93

15   Q.   And if you have some question, you haven't seen a
16        condition in some time, for instance, you want to go
17        back and look, you can go and check the photograph to
18        see if that is consistent with what you are seeing, is
19        that right?
20   A.   That's correct.
21   Q.   And that's -- is this a document that you use on a
22        frequent basis?
23   A.   Yes.
24   Q.   How often would you say you look at the photographs in
25        this document?

     Mr. Clark                          94

1    A.   Maybe once a week, or if I have something that I'm not
2         real sure of, I'll go back and make sure that it's
3         right.

Adjuster's work is audited every month for accuracy

P 98

14   Q.   Are you ever checked by anyone, management, in terms
15        of how you're doing your job?
16   A.   I'm audited once a month on -- on a given call and I
17        have to hold 25 to 30 units, and when the printout
18        comes in, the supervisor, which is Ron Forsyth, he'll
19        take the data and check it against my tires.  I keep
20        my tires that I run, and the first 25 I run I put up
21        on a skid and he'll check them for my accuracy.

Mr. Clark                              99

1    Q.   Very diplomatic.  Have you had in the last -- well,
2         since Mr. Forsyth has been checking your work, has he
3         ever expressed disapproval of the job that you're
4         doing?
5    A.   No.
6    Q.   Has he ever expressed disapproval of the job Mr. Eller
7         is doing?
8    A.   No.
9    Q.   Has he ever said to you, "You're adjusting tires
10        wrong.  You're letting nonadjustable conditions go
11        through" or "you're letting adjustable conditions go
12        through that shouldn't be," or anything of that
13        nature?
14   A.   No.
15   Q.   What is it that he checks?
16   A.   If I run a tire -- and when I say run, inspect it --
17        he checks and makes sure that my condition code that I

24

```
18        put on the tire is correct.  Like I say, he's going to
19        physically, you know, check it.  He checks my wear
20        percentage to make sure that I gauged it properly, to
21        make sure that I put in the right description serial
22        number on it and make sure if it's the condition code
23        for a whitewall, blackwall so the customer gets the
24        proper credit.
```

P 116

```
18   Q.   Some of the tires are not only looked at by the actual
19        dealer and then checked by the adjusters, but you're
20        telling us also that some percentage of those are
21        double-checked by management?
22   A.   In our processing center, quality control will send
23        them over so they can check too.
24   Q.   And that's a way of making sure and ensuring that
25        you're doing your job appropriately?
        Mr. Clark                          117
 1   A.   It's a three-fold check.
```

**The "CTNA Adjustments Include Customer Caused Tread Separations" Argument.**

Although Continental argues that its own adjusters cannot tell the difference

between a tread separation and damage done by underinflation or impact with a

road hazard, the evidence is to the contrary.

**IF THERE IS ANY EVIDENCE OF A USER CAUSED CONDITION, THEN THE**

**TIRE WILL NOT BE CLASSIFIED AS A TREAD SEPARATION**! Therefore, tires

that are classified as a tread separations have been determined by CTNA itself

not to be user caused, and consequently are covered under its warranty.

Clark depo p 116

```
13   Q.   I said if we get a printout showing that a tire has
14        been adjusted, that's because Continental's own
15        employees have agreed that it is an adjustable
16        condition?
17   A.   That's correct.
```

Eller depo p 16

```
18   Q.   Okay.  When you are adjusting tires, if you have more
19        than one condition that you see on a tire and one is
```

20      adjustable and one is not adjustable, what would you
21      do?
22  A.   I reject it.
23  Q.   Okay.  So the nonadjustable condition would take
24      precedence over the adjustable condition?
25  A.   Yes.  It voids the warranty.
   Mr. Eller                                              17
1  Q.   Okay.  So if the tire, for instance, has a tread
2      separation and also has an impact damage, you would
3      classify that as impact and it would not be
4      adjustable, correct?
5  A.   Right.
6  Q.   If you see a tire that is run underinflated or
7      overloaded, that is not adjustable, is it?
8                      MR. MORAN:  Object to the form of the
9          question.  You can go ahead.
10  A.   No, that's not adjustable.
11  Q.   If you saw that condition along with the tread
12      separation, it would be classified as nonadjustable,
13      underinflated/overloaded code condition, correct?
14  A.   Yes.

## Impact Damage – Clark Depo

25  Q.   And 4020, bruise, slash, impact break, slash, broken
   Mr. Clark                                             85
1      cords, what does that refer to?
2  A.   That's an impact break.  It's a nonadjustable.
3  Q.   When you -- it means the tire has hit something that
4      has broken the tire?
5  A.   Correct.
6  Q.   What do you see?
7  A.   Normally on impact I see an impact break from bead to
8      bead, that encompassed the tread.  You can usually
9      pull it apart like that.
10  Q.   Okay.  So it just breaks the entire casing?
11  A.   Right.
12  Q.   From one -- from the inner bead all the way around to
13      the outer bead or vice versa?  It goes all the way
14      through?
15  A.   Correct.
P 123
18  Q.   You can tell the difference between a tire that has
19      been driven that has an impact damage versus a tread
20      separation?
21  A.   I can.

26

Photo Ref Guide to tire adjustment conditions – p 28-29 shows Bruise/Impact Break (4220) as a NON-ADJUSTABLE CONDITION.

Warranty lists bruises and impact breaks as non-adjustable. (Charlotte Ex 65 – Exclusion #4)

Clark p 25

 22 Q.  You had a tire that had a tread separation but also
 23    showed evidence of impact damage.  Do you ever see
 24    that kind of a condition?
 25 A.  I do.
  Mr. Clark       26
 1 Q.  Would you code that as impact damage or code that as a
 2    tread separation?
 3 A.  Impact.

P 29

 23 Q.  So again, let's say hypothetically you have a tire
 24    with a tread separation and an impact break.  You've
 25    told us that would be coded as an impact break, right?
  Mr. Clark       30
 1 A.  Right.

Mr. Eller        17
 1 Q.  Okay.  So if the tire, for instance, has a tread
 2    separation and also has an impact damage, you would
 3    classify that as impact and it would not be
 4    adjustable, correct?
 5 A.  Right.


Underinflation – Clark Depo

 25 Q.  And 4240, underinflation, slash, overload, is in use?
  Mr. Clark       89
 1 A.  Right.
 2 Q.  And again, how do you tell by looking at the tire
 3    whether it's been underinflated or overloaded?
 4 A.  It will have a telltale line all the way around on
 5    both sides.
 6 Q.  A line inside the inner liner?
 7 A.  Outside.
 8 Q.  Outside the inner liner?
 9 A.  Outside.
 10 Q.  And is that a circumferential line around the
 11    sidewall?
 12 A.  Correct.

13   Q.   And that's from heat where the vehicle has -- where
14        the sidewall has been flexing?
15   A.   I'm not that knowledge on it, but I know what it is.
16   Q.   Okay.  So you can actually see the mark on the
17        sidewall from underinflation/overload?
18   A.   Correct.
19   Q.   All right.  How common is that condition?
20              MR. MORAN:  Object to the form of the
21        question.
22   A.   We see it occasionally.
23   Q.   In a given week how many passenger/light truck tires
24        would you see that on?
25   A.   Four or five, somewhere like that.

p 123

13   Q.   And you can tell the different between a tire that,
14        for example, has been driven underinflated or
15        overloaded and one that has a tread separation?
16              MR. MORAN:  Object to the form.
17   A.   I can.

Eller p 17

6   Q.   If you see a tire that is run underinflated or
7        overloaded, that is not adjustable, is it?
8              MR. MORAN:  Object to the form of the
9        question.  You can go ahead.
10   A.   No, that's not adjustable.
11   Q.   If you saw that condition along with the tread
12        separation, it would be classified as nonadjustable,
13        underinflated/overloaded code condition, correct?
14   A.   Yes.

Photo Reference Guide to tire adjustment conditions – p 31-33 shows
Underinflation/Overload (4240) as a NON-ADJUSTABLE CONDITION.

Warranty excludes damage or failure resulting from load, speed or inflation
practices causing excessive operating temperatures. (charlotte Ex 65 – exclusion
#4)

**Conclusion:**

For the above and foregoing reasons, Defendant CTNA's motions in

limine seeking to exclude admission into evidence of adjustment data of

substantially similar tires should be denied.

Dated this 17th day of August, 2005.

WILLIAM S. FRATES, II, P.A.

By: /s/ William S. Frates
       William S. Frates, II
       FL Bar No.: 107898
       Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 16, 2005, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Graeme Hancock, Esq.
Lawrence E. Palles, Esq.
Fennemore Craig
3003 North Central Avenue
Suite 2600
Phoenix, AZ  85012-2913
ghancock@fclaw.com
mreimann@fclaw.com

C. Vernon Hartline, Jr., Esq.
Scott Edwards, Esq.
Hartline, Dacus, Barger, Dreyer & Kern
6688 N. Central Expressway, Suite 1000
Dallas, Texas 75206-3900
hartline@flash.net

Thomas F. Dasse
Law Office of Thomas F. Dasse, P.C.
14646 N. Kierland Blvd., Suite 235
Scottsdale, AZ  85254
tdasse@dasselaw.com
jtomlinson@dasselaw.com

/s/ William S. Frates, II
William S. Frates, II